The Honorable Ricardo S. Martinez

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, SEATTLE DIVISION

| | |
|---|---|
| PANATTONI CONSTRUCTION, INC., a California corporation<br><br>      Plaintiff,<br><br> v.<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation<br><br>      Defendant. | NO. C11-1195 RSM<br><br>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>**NOTE FOR MOTION CALENDAR:**<br>**November 16, 2012**<br><br>**ORAL ARGUMENT REQUESTED** |

## I.  RELIEF REQUESTED

Plaintiff Panattoni Construction, Inc. ("Panattoni") hereby moves the court for an order granting its motion summary judgment on its claims against Defendant Travelers Property Casualty Company of America ("Travelers") on the basis that (1) the loss was fortuitous; (2) Travelers cannot prove an applicable exclusion would have removed the losses from coverage; and (3) Travelers' violated its duty of good faith and fair dealing in its investigation and handling of this claim, which is a per se violation of the Consumer Protection Act.

## II.  STATEMENT OF FACTS

### A.  BACKGROUND FACTS

This is a first party insurance coverage dispute under an all risk policy between

Plaintiff's Motion For Summary Judgment - 1
(NO. C11-1195 RSM)

**OLES MORRISON RINKER & BAKER, LLP**
701 Pike Street, Suite 1700
Seattle, WA 98101-3930
Phone: (206) 623-3427
Fax: (206) 682-6234

Panattoni and Travelers.   In 2009, the State of Washington, Department of General Administration, contracted with Panattoni for the construction of the Everett Community College Student Fitness and Health Center (the "Project").   (See Declaration of Steve Beauchamp ¶2).  The project consists of a 49,333 square foot new building which contains a large open gym as the central core surrounded by ancillary rooms on three sides.  (See Ex. 1 to Beauchamp Decl. ¶2).  The ancillary rooms are typical concrete slab on grade which are separated into four regions designated as Areas A, B, C and the Gym.  (See Ex. 1 to Beauchamp Decl. ¶2).

The project specifications for the cast-in-place concrete, Section 03300, required a submittal for each concrete mix, which shall list all materials and admixtures and their proportions, including but not limited to, water-cement ratio, slump, aggregate grading, and fly ash content.  (See Ex. 2 to Beauchamp Decl. ¶3)  The Specification also required laboratory test reports for the concrete materials and mix design as required in Section 03665 – Special Concrete Finishing; material certificates, and a concrete mock-up using the mix design proposal for the final work.  (See Ex. 2 to Beauchamp Decl.)  Contrary to Travelers' contention, Specification 03300 did not specify a hard trowel finish.  Specification Section 03300, Part 2 **PRODUCTS** defines "Concrete" as Portland Cement, aggregates, and water. (See Ex. 2 to Beauchamp Decl. ¶4)  The Portland Cement Association, which is the industry authority on cement, defines "concrete" as "a mixture of binding materials and course and fine aggregates.  (See Ex. 2 to Gatto Decl. ¶4).  Portland Cement and water are commonly used as the binding medium for normal concrete mixtures but may also contain porcelain, slag, and/or chemical admixtures."  (See Gatto Decl. ¶4).  Air is not within the definition of concrete nor is it part of the concrete material itself or a binding material.  (See Gatto Decl. ¶4).

Plaintiff's Motion For Summary Judgment - 2
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

1          Pursuant to Specification Section 03300, Panattoni's concrete subcontractor, Concrete

2    Nor-West, issued a submittal for the concrete mix design along with Cascade Testing

3    Laboratory's report on the mix design.  (See Ex. 3 to Beauchamp Decl. ¶4). The concrete

4    design mix included course and fine aggregates, water, cement, fly ash and admixtures and

5    alternative cementious materials to achieve the specific properties and to satisfy

6    environmental requirements.   (See Gatto Decl. ¶5).   The admixtures and alternative

7    cementious materials included fly ash, Tetraguard AS20 shrinkage reducing admixture by

8    BASF, and Pozzolith 200BN water-reducing admixture by BASF (See Gatto Decl. ¶ 5).

9    Contrary to Travelers' contention, the mix design did not specify any maximum air content,

10   much less approximately 1.22%.  (See Gatto Decl. ¶5),   The mix design noted that the

11   incidental air content within the concrete was expected to be approximately 0.33 cubic feet of

12   air per cubic yard of concrete (1.22%). (See Gatto Decl. ¶5).  This is not intended to be a

13   maximum, rather, it is the air content expected by the supplier to naturally be "entrapped"

14   within the concrete material given the concrete mix proportions and the anticipated mixing

15   methods. (See Gatto Decl. ¶5).  The reference to "air" is misleading because "air' is not a

16   germane factor with respect to concrete and is of little interest to the industry. (See Gatto

17   Decl. ¶5).  What is of interest is the amount and distribution of empty space within the

18   concrete material. (See Gatto Decl. ¶5).  The empty space is referred to as "air content" for

19   convenience.  (See Gatto Decl. ¶5).  On October 26, 2009, the mix design was approved for

20   use on the Project.  (See Ex. 3 to Beauchamp Decl. ¶4)

21         Specification Section 03365 required a hard trowel finish and the final finish of the

22   slab on grade was a polished exposed concrete floor.  (See Ex. 4 to Beauchamp Decl. ¶5).  To

23   achieve a hard trowel finish on a large slab, an electric or gasoline powered power trowel is

24   typically used and hand troweling used at corners.  (See Gatto Decl. ¶6).  In both power and

25   hand troweling, a steel blade is typically swiped across the surface of the concrete before it

26

Plaintiff's Motion For Summary Judgment - 3
(NO. C11-1195 RSM)

**OLES MORRISON RINKER & BAKER, LLP**
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

has fully hardened, which results in a small, hard, densified concrete surface.  (See Gatto Decl. ¶6).   The troweling must be performed prior to the concrete getting too hard but after the free water that naturally escaped from curing concrete has had an opportunity to do so. (See Gatto Decl. ¶6).

On January 19, 2010, Concrete Nor-West poured 42 yards of concrete slab mix continuously in Area A on the west side of the building.  (See Ex. 1 to Beauchamp Decl.¶2). Mayes Testing observed the placement of the concrete mix and took a cylinder sample from Area A.  (See Beauchamp Decl. ¶6).  After the concrete had cured, a hard trowel finish was performed.  No problems were observed in the concrete mix or the application of the hard trowel finish.  (See Beauchamp Decl. ¶6).  On January 21, 2010, Concrete Nor-West poured several more yards of concrete slab mix continuously in Area B.   (See Beauchamp Decl. ¶6). Mayes Testing observed the placement of the concrete mix and took a cylinder sample from Area B.  (See Beauchamp Decl. ¶6).  Mayes Testing Engineers' concrete test report from Area B dated January 22, 2010 shows that the air content was tested to be 2.4% and 2.5%. (See Beauchamp Decl. ¶6).   Again, after the concrete had cured, a hard trowel finish was performed.  No problems were observed in the concrete mix or the application of the hard trowel finish.  (See Beauchamp Decl. ¶6).  On January 22, 2010, Concrete Nor-West poured several more yards of concrete slab mix in Area C. (See Beauchamp Decl. ¶6).  Once again, after the concrete had cured, a hard trowel finish was performed.  However, during the final stages of applying a hard trowel finish on the slab in Area C, a surface peeling and delaminating effect was first noticed in several isolated areas on Slab A, B and C, but had not broken through the surface.  (See Beauchamp Decl.¶6). Concrete delamination describes a condition wherein a thin surface layer of concrete has become disconnected from the body of the concrete.  (See Gatto Decl. ¶8).  The areas were completely random within the slab, and varied in size.  (See Gatto Decl. ¶8).  There was no explanation for why only certain isolated

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

areas of the concrete slab were peeling and delaminating while other area in the same concrete pour exhibits no signs of peeling or delamination. (See Gatto Decl. ¶8).  WJE documented the areas of surface peeling and delamination on a foundation plan, which are indicated in blue hatching throughout areas on Slab A, B, and C.  (See Ex. 3 to Gatto Decl. ¶8).



A photograph taken by WJE shows an area of delaminated concrete surface surrounded by areas of nondelaminated concrete. (See Gatto Decl. ¶ 7).  Although the same concrete mix had been applied in Areas A, B and C, in several isolated areas the of the new concrete surface began separating from the underlying concrete. (See Gatto Decl. ¶8).  There was no explanation for why only certain isolated areas of the concrete were peeling and delaminating while other areas in the same concrete pour exhibited no signs of peeling or

Plaintiff's Motion For Summary Judgment - 5
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA  98101-3930
PHONE:  (206) 623-3427
FAX:  (206) 682-6234

delamination. (See Gatto Decl. ¶8)  The delaminated areas were not uniform across the entire

surface of the slab.  (See Gatto Decl. ¶8).  Concrete Nor-West retained the services of Ash

Grove, the cement supplier, to investigate the cause of the surface peeling and delamination

of the slab. (See Decl. of Kip Gatto ¶9). Ash Grove took two concrete core samples.  One of

the cores was not "finished", meaning it did not have a hard trowel finish performed on the

slab.  Ash Grove produced a report of their findings dated February 2, 2010.  (See Gatto

Decl. ¶9). There are inconsistencies in their findings and actual field applications.

Specifically, they stated that the delamination is a cause of "over finishing" but it is

undisputed that one of the core samples was not even finished.  (See Gatto Decl. ¶9).

Panattoni's expert, Kip Gatto of Wiss, Janney, Elstner Association ("WJE") , believes there

is no evidence that the concrete was improperly finished.    (See Gatto Decl. ¶9).  In fact,

Travelers' own expert, Lihe Zhang, who was first retained in July 2012, agrees that the

delamination was not the result of "overfinishing."   (See Ex. 1 to McKillop Decl., Depo. of

Lihe Zhang, 51:11 to 54:9). Ash Grove's report was challenged by the finish subcontractor's

expert, Structural Services, Inc. ("SSI").   SSI concluded there was no evidence or rationale

for the conclusion that the slab surface was improperly finished, which Mr. Gatto and Mr.

Zhang agree.  (See Ex. 1 to McKillop Decl., Depo. of Lihe Zhang, 51:11 to 54:9; Gatto

Decl.¶ 8). Due to the uncertainty of the cause of the peeling and delamination, Panattoni

retained Wiss, Janney, Elstner Association to conduct a more extensive investigation. (See

Beauchamp Decl. ¶7).

     WJE extracted four 3.2 inch diameter cores, labeled A, B, C, and D from Areas A, B

and C.  (See Gatto Decl. ¶10).  The four cores were sent to WJE's laboratory in Northbrook,

Illinois for petrographic examination. (See Gatto Decl. ¶10).  Cores A and B represent non-

delaminated concrete.  Core C represents fully delaminated concrete.  Core D was taken

adjacent to a delaminated region and represented incipiently delaminated concrete.  (See

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

Gatto Decl. ¶10). The petrographic report concluded Cores B and D are essentially identical, suggesting that the cores represent the same or similar concrete mixtures. (See Gatto Decl. ¶10). The portions of the concrete slabs represented Cores B and D are well consolidated and did not contain major cracks, large air voids or evidence of distress except for incipient delamination. Both cores B and D contained irregularly shaped air voids characteristic of entrapped air voids and spherical air voids that are characteristic of entrained air voids. However, the spherical air voids are larger than typical entrained air voids. (See Gatto Decl. ¶10). Core B did not exhibit delamination or incipient delamination. The surface of the concrete in Core B appears to be sound, with a few small deformed air voids at a depth of approximate 0.1 inch over a length of approximately 3 inches at the top of the core. (See Gatto Decl. ¶10). However, the surface did not exhibit any microcracks connecting the flattened void. (See Gatto Decl. ¶10). Core D exhibited incipient delamination at a depth of approximate 0.1 inch over approximately ½ of the top surface of the section of the core. The surface regions did not exhibit a layer of high water cementitious materials ratio paste as would be expected if early finishing trapped bleed water below the surface closed by troweling. (See Gatto Decl. ¶10). Core C exhibited full delamination of the top 0.1 inch from the body of the concrete. Delamination in Core C occurred below the trowel-densified surface at a depth of 0.1 inch. WJE's petrographic testing found that that the concrete was not purposefully air entrained because the spherical air voids are larger than typical entrained air voids. (See Gatto Decl. ¶10). Kip Gatto of WJE believes that there was no adverse chemical reaction in the concrete, and that the elevated air content was not chemically introduced or air entrained. (See Gatto Decl. ¶10). Kip Gatto also concluded that the delamination was not caused by "early finishing", which is not a technical term but generally understood to refer to concrete finished while bleed water is still present at the surface. (See Gatto Decl. ¶10). In this case, the petrographic testing confirmed there was no bleed water

Plaintiff's Motion For Summary Judgment - 7
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

trapped beneath the surface of the concrete.  (See Gatto Decl. ¶10).  Mr. Zhang agrees that the Ash Grove's findings of "early finishing" is not supported by the evidence and that the delamination was not caused by "early finishing."  (See Ex. 1 to McKillop Decl., Depo. of Zhang, 75:18 to 76:23).

The concrete that was delivered to the project was tested and complied with the specifications for the project.  (See Gatto Decl. ¶11).  Mr. Zhang agrees that Concrete Nor-West February 2010 shrinkage testing of the submitted mix design complied with the design specifications.  (See Ex. 1 to McKillop Decl., Depo. of Zhang, 55:1 to 56:1).  Moreover, the testing showed no evidence of any contamination in the concrete mix in any of the cores. (See Gatto Decl. ¶11).  Mr. Zhang agrees that the admixture and accelerator or water did not cause the delamination and that there is no evidence of any contamination in the concrete mix that could have caused the delamination.  (See Ex. 1 to McKillop Decl., Depo. of Zhang, 56:2 to 57:16 and 77:10-17).  Mr. Zhang admitted that his expert report never mentioned anything about a possible chemical reaction in the mix as a cause of the delamination.  Mr. Zhang also testified in his deposition that he was just speculating that a possible chemical reaction happened in the mix to cause the delamination, and admitted he did not know what reaction that could possibly be.  (See Ex. 1 to McKillop Decl., Depo. of Zhang, 63:9 to 64:2 and 64:15-20 and 73:2-5).  Moreover, Mr. Zhang testified in his deposition that the concrete delamination was not the result of a "latent defect", which Mr. Zhang described in his report as "one that would not have been discovered by reasonable inspection."  (See Ex. 1 to McKillop Decl., Depo. of Zhang, 64:3-14).

Concrete Norwest inspected their concrete batch plant at Everett as well as its batch plant east of Marysville and found no evidence of malfunctioning equipment involved in the batching of the concrete.  (See Gatto Decl. ¶11).  Concrete Norwest also inspected their aggregate stockpiles and found no contaminants.  (See Beauchamp Decl. ¶8).  Mr. Gatto

Plaintiff's Motion For Summary Judgment - 8
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

believes that concrete installed on the Project met the project specifications and was not

faulty or defective material in any way.  (See Gatto Decl. ¶11).  In fact, all of the concrete

below the top ¼" (the body of the concrete slab) is not faulty or defective and is structurally

sound and remains serviceable for its intended use. (See Gatto Decl. ¶11).  Moreover, Kip

Gatto is of the opinion that the application of the hard trowel finish was done according to

customary practices. (See Gatto Decl. ¶10).  Kip Gatto concluded that a high air content is

the cause of the delaminating concrete, but that the cause of the elevated air content in the

concrete cannot be ascertained.  (See Gatto Decl. ¶12).  Mr. Zhang agrees with Mr. Gatto's

opinion.  (See Ex. 1 to McKillop Decl., Depo. of Zhang, 62:25 to 63:3).  Mr. Zhang also

agrees that the concrete was installed as originally designed and complied with the contract

document prior to exhibiting delamination.  (See Ex. 1 to McKillop Decl., Depo. of Zhang,

63:9-16).  Kip Gatto does not believe that the high air content was caused by any faulty

material or faulty workmanship.  (See Gatto Decl. ¶12).  The petrographic testing revealed

that the spherical air voids in the concrete were larger than those consistent with intentionally

entrained air, and were not indicative of intentionally entrained air.  (See Gatto Decl. ¶10).

This indicates that the elevated air voids were not chemically introduced.

     Although WJE determined that the primary cause of the delamination was an elevated

air content within the concrete materials in conjunction with a hard trowel finishing being

applied to the slab, no one can explain how or what caused the elevated air content within the

concrete.  (See Gatto Decl. ¶10).    In fact, Travelers' expert, Lihe Zang, testified that the

concrete was installed as originally designed and met the contract specifications prior to

exhibiting delamination, and that he could only speculate as to the possible reasons for the

elevated air content in the concrete.  (See Ex. 1 to McKillop Decl., 63:17 to 64:20 and 68:18

to 69:11).  In fact, Mr. Zang admits that he has no better knowledge than WJE as to the cause

of the elevated air content in the concrete.  (See Ex. 1 to McKillop Decl., 69:18 to 70:21).

Plaintiff's Motion For Summary Judgment - 9
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA  98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

Mr. Gatto believes that determining what caused the elevated air content would be pure speculation, and could have been caused by a number of factors including environmental effects. (See Gatto Decl. ¶10).

The delaminating surface of the concrete is compounded by the fact that the intended finish of the slab on grade was a polished exposed concrete floor.  (See Beauchamp Decl. ¶9).  Thus, just removing the delaminating areas and patching them with a floor preparation filler was not an option.  (See Beauchamp Decl. ¶9).  Panattoni had to completely grind down all of the exposed concrete in Areas A, B and C a ¼" and use several polishing and patching steps to achieve a similar finish to the original specifications.  (See Beauchamp Decl. ¶9).  Panattoni retained Concrete Restoration, Inc. to remove the top layer of the delaminating concrete, polish the slab, and seal and patch the concrete.   (See Beauchamp Decl. ¶9).  Additionally, since the wall framing contractor had already placed the wall framing layout in Area B, the wall framing had to be torn down and reinstalled.  (See Beauchamp Decl. ¶9).  The underslab vapor barrier in some areas was also ruined after the concrete delamination was discovered and had to be replaced.  (See Beauchamp Decl.).  Also, core drilling had to be done at several cast in place floor drains to lower these drains after the slab was ground down ¼".  (See Beauchamp Decl. ¶9).  This additional slab grinding also required the structural steel installed in Area A to be lowered.  (See Beauchamp Decl. ¶9).  The added work for grinding the delaminating slabs delayed the installation of the remaining structural steel installation in Area B & C.  (See Beauchamp Decl. ¶9).  As a result, Panattoni incurred acceleration costs from the steel erector J&S to make up for this lost time.  (See Beauchamp Decl. ¶9).  Panattoni incurred $190,470 as a result of the delaminated concrete.  (See Ex. 5 to Beauchamp Decl. ¶9).

**B.    TRAVELERS ALL RISK INSURANCE POLICY AND ADJUSTING OF CLAIM.**

Plaintiff's Motion For Summary Judgment - 10
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

Travelers issued a Commercial Inland Marine all risk insurance policy to Panattoni. (See Ex. 2 to McKillop Decl.). Under the policy, Travelers was required to "pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss." (See Ex. 2 to McKillop Decl., Impak Coverage Form A. Coverage.) "Covered Property" was defined as "Builders' Risk." The policy defines "Covered Causes of Loss" as "Risks of Direct Physical loss or damage except those causes of loss listed in the Exclusions or for which "No Coverage" is shown as the application Limit of Insurance in the Declarations." (See Ex. 2 to McKillop Decl.). The policy provides coverage for "Soft Costs" during the "period of delay in completion" which result from loss of or damage to Covered Property from any of the Covered Causes of Loss which delays the completion of the "project" beyond the "planned completion date." (See Ex. 2 to McKillop Decl., IM Pak Coverage Form, A(3)). The policy also provides coverage for expenses to reperform similar work because of loss of or damage to Covered Property by a Covered Cause of Loss. (See Ex. 2 to McKillop Decl., IM Pak Coverage Form, A(5)(a)(2)). Finally, under the policy, Travelers is required to pay for expediting costs and additional costs of construction materials and labor to repair the Covered Property, and the increased costs to make changes in construction specifications. (See Ex. 2 to McKillop Decl., IM Pak Coverage Form, A(5)(g)(1)(a-b) and (2)). The policy specifically excludes certain losses or damage, including those caused by or resulting from "omission in or faulty, inadequate or defective "materials, workmanship or maintenance." The exclusion for faulty materials and workmanship contains a resulting loss clause providing that "if loss or damage by a Covered Cause of Loss results, [Travelers] will pay for that resulting loss or damage." (See Ex. 2 to McKillop Decl., IM Pak Coverage Form, B(3), page 9 of 19).

In July 2010, Panattoni submitted a claim to Travelers for its damages caused by the concrete peeling and delamination in the amount of $190,470.00, plus prejudgment interest

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

and attorney's fees.  (See Ex. 3 to McKillop Decl.).  Travelers assigned the claim to Igor Andreyev, an inexperienced, unqualified adjuster with only four years of experience adjusting claims.  (See Ex. 4 to McKillop Decl., Andreyev Depo., 8:20 to 12:4).  Mr. Andreyev had no previous scientific or technical and had never handled a claim involving allegations concerning concrete.  (See Ex. 4 to McKillop Decl., Andreyev Depo., 8:20 to 12:4; 34:17-23; Declaration of Jim Schratz).  On August 4, 2010, approximately 3 weeks after receiving the claim, Ms. Andreyev sent a reservation of rights letter to Panattoni. (See Ex. 5 to McKillop Decl.).  On September 13, 2010, there is a note in the claim file by Lisa Arnot stating "reviewed file over 30 days old all documentation in; diary set to f/u on file 9/3 status letter is past due please move claim to closure asap."  (See Ex. 6 to McKillop Decl.). On October 1, 2010, Mr. Andreyev sent a letter to Panattoni denying the claim stating in part, that Travelers had concluded its investigation of the claim and based on expert analysis, "the damages to the concrete slab were likely to have resulted from "Over Finishing" of the surface or faulty and contaminated material used in the job."  (See Ex. 7 to McKillop Decl.).

On October 27, 2010, Kip Gatto of WJE responded to Travelers' October 1, 2010 denial letter and disputed the assertion that WJE concluded that over finishing or faulty material was the cause of the delamination.  (See Ex. 4 to Gatto Decl.).  Mr. Gatto stated in his letter did that "WJE did not conclude that over finishing was a cause of the delamination and we did not identify any faulty materials."  (See Ex. 4 to Gatto Decl.).  Mr. Gatto's letter also stated that "We did note that an elevated air content was the primary cause of the delamination and that the air voids were larger than those typically encountered in purposefully air entrained concrete" and that "we did not identify any significant adverse conditions within the concrete material constituents (cement and aggregates), but rather, an elevated air content within the concrete."  (See Ex. 4 to Gatto Decl.).  Mr. Gatto pointed out that in the test results of trial batching, which used the same mix constituents and proportions

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

used on the project, they were not able to reproduce the elevated air contents measures in the as-placed concrete. Mr. Gatto concluded that the elevated air content in the concrete mix was unexpected by all involved parties, and that the cause is unlikely to ever be determined. (See Ex. 4 to Gatto Decl.). On November 4, 2010, Panattoni sent WJE's October 27, 2010 letter to Travelers and demanded that it reconsider its denial. (See Ex. 8 to McKillop Decl.). Panattoni also sent an e-mail from Dave Enters dated March 16, 2010 which contained the results of additional testing which showed no evidence of an air-entraining agent added to the concrete.

On December 2, 2010, Panattoni's counsel sent an e-mail to Mr. Andreyev asking for a response to her November 4, 2010 request for reconsideration. (See Ex. 9 to McKillop Decl.). On January 25, 2011, approximately five weeks later. Mr. Andreyev left a voice mail stating that he was reviewing the claim and her request for coverage consideration and will be providing a response shortly. (See McKillop Decl.). On February 18, 2010, there is a claim note that states "response from counsel received denial will not be revised and stands completed response letter to attorney sent to UM for approval." (See Ex. 6 to McKillop Decl.). Mr. Andreyev admitted that after receiving Panattoni's request for reconsideration, he did no additional investigation prior to denying the request for reconsideration on April 5, 2011. (See Ex. 4 to McKillop Decl., Depo. Andreyev, 126:2 to 127:14). On April 5, 2010, Mr. Andreyev sent a letter to Panattoni's counsel stating: "There has been no evidence provided that indicates this failure to meet the specifications was caused in any way by a fortuitous event outside the construction process" and that "Therefore, we have concluded that the damage is directly related to the construction process" and "As a result the policy exclusions as previously stated would apply." (See Ex. 10 to McKillop Decl.). Mr. Andreyev testified that despite the reference, Travelers did not deny the claim based on the exclusion for defective design or specifications. (See Ex. 4 to McKillop Decl., Andreyev,

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

128:14 to 129:22).

Mr. Andreyev testified in his deposition that Travelers' Property Best Practices manual states that a field investigator should be retained on the claim over $10,000. (See Ex. 4 to McKillop Decl., Andreyev, 26:11 to 31:17). Mr. Andreyev admitted in his deposition that he did not do an independent investigation of the claim nor did he retain any independent third party adjuster or expert to assist him prior to denying Panattoni's claim. (See Ex. 4 to McKillop Decl., Depo. Andreyev, 51:1 to 57:2 and 71:8 to 73:4; 78:21 to 82:25). Mr. Andreyev admitted in his deposition that he relied solely on WJE's report and came up with his own conclusion that faulty and contaminated material caused the delamination. Mr. Andreyev also admitted that he has not received any expert opinion or report claiming that the high air content in the concrete was a defective material. (See Ex. 4 to McKillop Decl., Andreyev, 121:20 to 122:11).

Panattoni's expert, Jim Schratz, concluded that Travelers failed to meet the industry standard for proper claims handling, acted unreasonably and failed to meet its own standard in giving as much weight to the insured's interest as to its own in a number of areas, including that:

1.  Travelers assigned an inexperienced, unqualified adjuster to Panattoni's claim, who had never handled a concrete claim and had no scientific or technical background to make a scientifically-based opinion concerning coverage for this claim and lacked basic knowledge concerning Travelers' fiduciary duties" to its insureds.
2.  Travelers failed to conduct its own independent investigation into the cause of the damages.
3.  Travelers improperly tried to shift the non-delegable duty to investigate to the insured. The insured has a duty to cooperate but has no duty to conduct an investigation and Travelers attempts to ignore its duty is unreasonable.
4.  Travelers failed to meet the industry standard and its own standards for property claims handling by failing to give as much weight to the insured's interests as to its own interests.
5.  Travelers failed to meet many of its own guidelines which are basic standards in the industry for property claims handling, including failure to document the file and

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

1  contact the insured promptly after a final coverage determination was made, failure to
2  inform Panattoni of its claim process, expected time frames, and failure to keep
   Panattoni informed of the status of the claim.

3  (See Declaration of Jim Schratz).

4  ### III.    ARGUMENT AND AUTHORITIES

5  ### A.    ALL RISK INSURANCE COVERAGE

6  Interpretation of language in an insurance policy is a question of law. *Allstate Ins.*
7  *Co. v. Peasley*, 131 Wn.2d 420, 423-24, 932 P.2d 1244 (1997).   Courts in Washington
8  construe insurance policies as an average person would purchasing insurance, giving the
9  language a fair, reasonable and sensible construction. *Key Tronic Corp. v. Aetna (CIGNA)*
10 *Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 627, 881 P.2d 201 (1994).  Ambiguities in the
11 policy are constructed against the drafter-insurer. *Queen City Farms, Inc. v. Cent. Nat'l Ins.*
12 *Co. of Omaha*, 126 Wn.2d 50, 68, 882 P.2d 703 (1994).   Basically, if a reasonable
13 interpretation of the provision would result in coverage, the court must find coverage.
14 *Allianz Insurance Company v. Impero*, 654 F.Supp. 16 (1986).  Moreover, exclusions from
15 insurance coverage are contrary to the fundamental protective purpose of insurance, and are
16 construed strictly against the insurer. *State Farm Fire & Cas. Co. v. Ham & Rye LLC*, 142
17 Wn.App. 6, 13, 174 P.3d 1175 (2007).

18 Here, Panattoni purchased an "all-risk" policy that covered risks of direct physical
19 loss or damage to the construction site unless the loss was excluded. All risk policies,
20 contrary to a property insurance policy or a commercial general liability policy, provide
21 coverage for all risks unless the specific risk is excluded. *Findlay v. United Pac. Ins. Co.*,
22 129 Wn.2d 368, 378, 917 P.2d 116 (1996) (noting that in an all-risk policy, "any peril that is
23 not specifically excluded in the policy is an insured peril"); *McDonald v. State Farm Fire &*
24 *Cas. Co.*, 119 Wn.2d 724, 731 n. 5, 837 P.2d 1000 (1992) (describing all-risk insurance as "a
25 promise to pay upon the fortuitous and extraneous happening of loss or damage … from any

26

**OLES MORRISON RINKER & BAKER, LLP**
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

1 cause whatsoever … unless that cause is specifically excluded").  The purpose of all-risk

2 builder's insurance is to shift the risk of loss away from the contractor and the owner and to

3 place it upon an insurer. *Frank Coluccio Constr. Co. v. King County*, 136 Wn.App. 751, 767,

4 150 P.3d 1147 (2007).   An "all risk" policy therefore differs from a traditional "named peril"

5 policy.  All risk protection extends to the kind of loss that is not usually covered under other

6 insurance.

7 **B.    PANATTONI'S LOSS WAS FORTUITOUS**

8          For recovery under an all risks policy, an insured only need demonstrate that a

9 fortuitous loss has occurred.  *Frank Coluccio Constr. Co. v. King County*, 136 Wn.App. 751,

10 767-768, 150 P.3d 1147 (2007).   However, the insured need not demonstrate the precise

11 cause of damage for the purpose of proving fortuity. *Churchill v. Factory Mut. Ins. Co.*, 234

12 F.Supp. 2d 1182 (2002). The burden of demonstrating fortuity is not a particularly onerous

13 one.   *Frank Coluccio Constr. Co. v. King County*, 136 Wn.App. 751, 768, 150 P.3d 1147

14 (2007).  The determination of whether a loss is "fortuitous" has three components (1) a loss

15 which was certain to occur cannot be fortuitous; (2) in deciding whether a loss was

16 fortuitous, a court should examine the parties' perception of risk at the time the policy was

17 issued; (3) a loss which could not be reasonably be foreseen by the parties at the time the

18 policy was issued is fortuitous. *Frank Coluccio Constr. Co. v. King County*, 136 Wn.App.

19 751, 768, 150 P.3d 1147 (2007).  The test for fortuity is a subjective, not objective, one and

20 involves questions of fact.  *Hillhaven Props., Ltd. v. Sellen Constr. Co.*, 133 Wn.2d 751, 758,

21 948 P.2d 792 (1997).

22          Here, there is no factual dispute that Panattoni suffered losses on the Project as a

23 result of the delaminated concrete, which resulted in actual damages.  The facts demonstrate

24 that the elevated air content in the concrete and delamination of areas of the concrete was not

Plaintiff's Motion For Summary Judgment - 16
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

certain to occur, and that Panattoni could not have reasonably foreseen the losses at the time the contract was signed or during construction. The losses were fortuitous and should have been covered by Travelers' builders risk policy.

## C. TRAVELERS HAS THE BURDEN TO PROVE AN APPLICABLE EXCLUSION APPLIES

It is Travelers' burden to prove that an applicable exclusion would have removed the losses from coverage. *Pub. Employees Mut. Ins. Co. v. Rash*, 48 Wn.App. 701, 703–04, 740 P.2d 370 (1987). In Travelers' October 1, 2010 denial letter, it stated that the damages to the concrete slab were "likely to have resulted from Over Finishing of the surface or faulty and contaminated material used in the job." Travelers cannot assert grounds for denying Panattoni's claim other than those raised in its denial letter. *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wn.2d 501, 520-521, (2012). First, there is no evidence that the delamination was caused by "over finishing." In fact, the petrographic testing confirmed that the delamination was not caused by over finishing. Moreover, both WJE and Travelers' expert agree that the delamination was *not* caused by over finishing.

Second, the faulty material exclusion does not apply here because there is no evidence supporting application of the exclusion, i.e., there is no evidence of faulty materials. There is no dispute that the concrete mix design met the project specifications. Air or "empty space" is not within the definition of concrete and is not considered part of the concrete material. Moreover, the mix design did not contain an air-entraining agent. Also, the petrographic testing showed no evidence of any contamination in the concrete mix in any of the cores. Obviously, if the concrete had been contaminated, the entire concrete slab would have shown signs of delamination. Travelers' own expert agrees that the admixture and accelerator or water did not cause the delamination and that there is no evidence of any contamination in the concrete mix that could have caused the delamination. The mix design

Plaintiff's Motion For Summary Judgment - 17
(NO. C11-1195 RSM)

noted that the incidental air content within the concrete was expected to be approximately 0.33 cubic feet of air per cubic yard of concrete, which is the air content (empty space) that naturally can be expected to be "entrapped" within the concrete material after mixing.  The delamination occurred in isolated areas, while other areas within the same concrete pour did not exhibit any delamination.  Traveler's own expert agrees with WJE that he could only speculate as to the cause of the elevated air in the concrete.

This case is similar to *Frank Coluccio Const. Co., Inc. v. King County*, 136 Wn.app. 751, 150 P.3d 1147 (2007).  In that case, King County undertook a public works project for the construction of a small tunnel under the Duwamish Waterway for utility services.  FCCC was the general contractor responsible for constructing the tunnel.  DBM was responsible for constructing an access shaft at the eastern end of the tunnel.  Although DBM followed the same construction methods and procedures used on the previously constructed piles, problems arose during the installation of the final pile.  While the concrete was being pumped into the hole drilled for the final pile, the pipe used to convey concrete into the hole became stuck while the concrete level was 70 feet below the surface.  Later, as a shaft was being dewatered, a blow-in occurred.  The shaft was successfully excavated and repairs delayed construction of the tunnel by two months. FCC incurred expenses during the delay related to costs of equipment, site maintenance, and labor.  *Id.* at 758. Not a single witness could explain how or why the pipe became stuck, and King County's expert testified it would require speculation on his part as to how or why the pipe became stuck.  The court ruled that King County failed to prove that the losses suffered by FCCC fell within the provisions of the faulty workmanship exclusion in an all risk policy, and found it would would have been impossible for King County to make such a showing at trial. *Frank Coluccio Const. Co., Inc. v. King County*, 136 Wn.app. 751, 769-773, 150 P.3d 1147, (2007)(citing 9A Less R. Russ & Thomas F. Segalla, Couch on Insurance § 132:21 at 132:28 to 132-29 (3d ed. 1995).

Plaintiff's Motion For Summary Judgment - 18
(NO. C11-1195 RSM)

Here, like the *Frank Coluccio* case, the cause of the loss is unknown and cannot be determined without resorting to speculation. The only evidence is that the elevated air content in the concrete was from an act of God, which is a covered event and peril. There is no evidence of any faulty material that would fall under any exclusion found in Travelers' policy. It is difficult to believe that the average insured would not equate a mysterious loss with a fortuitous loss and would not believe that this was a risk or hazard against which he had insured when he purchased all risk insurance. In fact, an all risk insurance is designed for this very purpose which is to protect the insured in those cases where difficulties and logical explanation of the cause of the loss cannot be determined. If Travelers did not wish to insure against this broad risk, it should have incorporated an exclusionary clause in their policy exempting from coverage "unsuspected or unexplained losses".

Travelers will attempt to argue that the faulty "material" exclusion really means faulty "end product", and that the delaminated concrete is a faulty "end product" and thus excluded under the faulty material exclusion. There is a strained interpretation of the policy. There is nothing in the language of the policy at issue that indicates that the term faulty "material" means faulty "end product." Travelers' policy excludes faulty or defective "materials, workmanship or maintenance." The policy does not exclude "faulty product". The faulty "materials" term appears within the exclusion before "workmanship" and "maintenance," which indicates that it must mean something distinct from workmanship or maintenance, or else it would be superfluous. Travelers would interpret the term "materials" to mean the same thing as "workmanship" which it asserts means the same thing as the finished product. Washington law requires that the court give effect to the plain meaning of each contract exclusion. *Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 378, 917 P.2d 116 (1996). There is nothing reasonable about Travelers' interpretation of "materials" under the exclusion. Travelers' interpretation of "faulty materials" relies on the notion that "faulty

Plaintiff's Motion For Summary Judgment - 19
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

materials" is the same as "faulty workmanship", and that therefore excludes damage caused by both a faulty process and a faulty finished product. We have not found a single case in the United States that has interpreted "faulty material" to be the same as "faulty workmanship", and including the finished product.

Under Travelers' interpretation, the faulty material exclusion is ambiguous. An insurance contract is ambiguous if the court finds that the language is susceptible to different interpretation. *Hall v. State Farm Mut. Auto. Ins. Co.*, 133 Wn.App. 394, 399, 135 P.3d 941 (2006). If a clause is ambiguous, the court will "construe any ambiguity strictly against the insurer and in favor of the insured." *Id.*, *citing Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005). Moreover, in *Allstate Ins. Co. v. Smith*, 939 F.2d 447, 450 (9th Cir. 1991), the Ninth Circuit Court of Appeals interpreted a "faulty workmanship" provision in an all-risk policy and found this provision ambiguous because it was susceptible to at least two different interpretations: to include a flawed product or a flawed process. Thus, not only is "workmanship" ambiguous, Travelers' interpretation of "materials" as the same as "workmanship" is even more ambiguous. The court must interpreted the "faulty materials" exclusion in light most favorable to Panattoni. 929 F.2d. at 450. Here, the evidence shows that the delaminated concrete was not caused by "over finishing" or faulty or defective materials. Any interpretation of faulty "material" to include a flawed product is unreasonable and runs contrary to the principles of contract interpretation. The court must resolve ambiguities against the insurer. *Kish v. Ins. Co. of N. Am.*, 125 Wn.2d 164, 171, 883 P.2d 308 (1994).

In this case, Travelers cannot meet its burden to show that the loss is excluded under the faulty material exclusion. Thus, the court should grant Panattoni's motion for summary judgment and find that the loss is covered under the policy.

**D.    THE ENSUING LOSS PROVISION**

Plaintiff's Motion For Summary Judgment - 20
(NO. C11-1195 RSM)

Travelers' "faulty material" exclusion contains an ensuing loss provision that covers damages resulting from faulty materials if they are caused by an otherwise covered loss. This provision of coverage for damage caused by the excluded "faulty materials" is referred to as an "ensuing loss" provision or a "resulting loss" provision.  While coverage may be excluded when a certain peril causes a loss, a resulting or ensuing loss clause operates to carve out an exception to the policy exclusion. *McDonald v. State Farm Fire & Cas. Co.,* 119 Wn. 2d 724, 734, 837 P.2d 1000 (1992).  In this way, ensuing loss clauses limit the scope of what is otherwise excluded under the policy.  Such clauses ensure "that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered. The uncovered event itself, however, is never covered." *McDonald,* 119 Wn.2d at 734, 837 P.2d 1000.

However, because Travelers cannot prove that a "faulty material" exclusion applies to the losses suffered, the resort to an "ensuing loss" provision is unnecessary. *Frank Coluccio Const. Co., Inc. v. King County*, 136 Wn.app. 751, 150 P.3d 1147 (2007)(the trial court ruled that King County did not prove that a "faulty workmanship" exclusion applied to the losses suffered…therefore, a resort to an "ensuing loss" provision is unnecessary.)  However, even if this court finds that Travelers has proved that the "faulty material" exclusion applies, the resulting loss caused by the delaminated concrete is covered, including the costs to replace the wall framing layout in Area B, the replacement of the underslab vapor barrier, the core drilling of the cast in place floor drains, the delay in the installation of the structural steel. The resulting loss is considered a distinct property loss ensuing from the otherwise excluded "faulty material".

Moreover, Travelers policy provided coverage for costs to expedite repair of Covered Property and additional cost of construction materials and labor, and costs to make changes in the construction specifications.  The policy covered Panattoni's acceleration costs from the

Plaintiff's Motion For Summary Judgment - 21
(NO. C11-1195 RSM)

steel erector J&S, the costs of the additional core drilling for the cast in place floor drains, and the costs of lowering of the structural steel in Area A.   Because this claim is liquidated, Panattoni is also entitled to prejudgment interest of 12% from the date Panattoni paid the claim. *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32 (1968); RCW 19.52.020.

## E.   TRAVELERS' BAD FAITH AND VIOLATION OF THE CONSUMER PROTECTION ACT

Washington recognizes a duty of good faith between an insurer and an insured, which is akin to a fiduciary duty. *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385-86, 719 P.2d 133 (1986); RCW 48.01.030.  This duty implies more than the honesty and lawfulness of purposes but implies a broad obligation of fair dealing and a responsibility to give equal consideration to the insured's interests.  *Id.* In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded.  *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 485, 78 P.3d 1274 (2003).  In *Coventry v. American States Ins. Co.*, 136 Wn.2d 269, 961 P.2d 933 (1998), an insurer refused to cover damage to a construction site caused by a mudslide after its adjuster performed only a brief, and incorrect assessment. *Coventry*, 136 Wn.2d at 274, 961 P.2d 933. The Washington State Supreme Court ruled that the insurer violated its duty of good faith and fair dealing by its deficient investigation, even though the ultimate denial of coverage was correct. *Id.* at 285, 961 P.2d 933.  The court also rejected American States' argument of "no harm, no foul" rule in which bad faith is not actionable when the insured's policy does not provide coverage for the loss. *Coventry*, 136 Wn.2d at 279.

Here, Travelers violated its statutory and contractual duties by failing to conduct its own independent investigation of the claim before denying the claim, and attempted to shift its non-delegable duty to investigate to the insured. WAC 284-30-330(3) (4) .  *Coventry Assoc. v. Am. States Ins. Co.*, 136 Wn.2d 269, 281, 961 P.2d 933 (1998)(finding that a

Plaintiff's Motion For Summary Judgment - 22
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

reasonable investigation is required before coverage is denied). Travelers' adjuster admitted that he failed to conduct his own investigation and relied solely on WJE's reports to deny coverage, even though WJE's reports directly refuted his claim that the loss was caused by "over finishing" and "faulty materials". Under Washington law, every insurer has a duty to act promptly, in both communication and investigation, in response to a claim. WAC 284-30-330(2)-(4); WAC 284-30-360(1), (3); WAC 284-30-370. Travelers also failed to meet its own standard and statutory obligations for proper claims handling by failing to give as much weight to the insured's interest as its own, and ignoring WJE's reports which refuted Travelers' conclusion that this claim was caused by "over finishing" or "faulty materials". Any attempt by Travelers to now assert new grounds for denying Panattoni's claim other than those raised in its denial letter should be stricken. *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wn.2d 501, 520-521, (2012).

The Insurance Commission has promulgated regulations that define specific acts and practices that constitute a breach of an insurer's duty of good faith. RCW 48.30.010. A first party insured may bring an action for violation of the CPA based upon a violation of RCW 48.30.010(1) resulting from a single violation of WAC 284.30.330 through WAC 284.30.390. Generally, to prevail on a CPA claim, the claimant must satisfy the five-part test announced in *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 719 P.2d 531 (1986), which includes: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act. 105 Wn.2d 778, 784-85. A violation of an insurance regulation constitutes an unfair trade practice. *Ledcor Industries (USA), Inc. v. Mutual of Enumclaw Ins. Co.*, 150 Wn.App. 1, 12, 206 P.3d 1255 (2009). Further, an insurers' bad faith constitutes a per se violation of the CPA. *Ledcor*, 150 Wn.App. at 12, P.3d 1255. Travelers' violation of the regulations related

Plaintiff's Motion For Summary Judgment - 23
(NO. C11-1195 RSM)

OLES MORRISON RINKER & BAKER, LLP
701 PIKE STREET, SUITE 1700
SEATTLE, WA 98101-3930
PHONE: (206) 623-3427
FAX: (206) 682-6234

to unfair and deceptive practices impact the public interest and is a per se violation of the CPA. As a result of Travelers' bad faith and violation of the CPA, Panattoni was forced to pay for damages that are covered under the policy.

**F.      PANATTONI IS ENTITLED TO ITS ATTORNEY'S FEES AND COSTS**

In *Olympic Steamship v. Centennial Insurance*, 117 Wn.2d 37, 811 P.2d 673 (1991), the Washington Supreme Court adopted a common law rule allowing an insured to recover attorneys' fees in coverage litigation. Panattoni its entitled to an award of it attorney's fees and costs incurred to establish its rights under the policy.

## IV.      CONCLUSION

The court should grant Panattoni Construction, Inc.'s motion for summary judgment and award it damages of $190,470.00, plus prejudgment interest, punitive damages and attorney's fees and costs.

DATED this ___24___ day of October, 2012.

OLES MORRISON RINKER & BAKER LLP
By _____
Eileen I. McKillop, WSBA 21602
701 Pike Street, Suite 1700
Seattle, Washington  98101-3930
mckillop@oles.com
Phone:  (206) 623-3427
Fax:  (206) 682-6234
Attorney for Plaintiff Panattoni Construction, Inc.

4811-1587-2529, v.  1

Plaintiff's Motion For Summary Judgment - 24
(NO. C11-1195 RSM)

1

CERTIFICATE OF SERVICE

2
            I hereby certify that I electronically filed the foregoing PLAINTIFF'S MOTION

3
FOR SUMMARY JUDGMENT, with the Clerk of the Court using the CM/ECF system,

4
which will send notification of such filing to the following attorneys of record registered

5
for ECF notification in this case:

6
            Attorneys for Travelers Property Casualty Company of America:

7

8
            James Thomas Derrig      eservice.derriglaw@me.com

9
            I certify under penalty of perjury that the foregoing is true and correct.

10
            DATED this __ day of October 24, 2012, in Seattle, Washington.

11

12
                                                       Catherine Melland

13

14
4831-0423-3233, v.  1

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiff's Motion For Summary Judgment - 25
(NO. C11-1195 RSM)